UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CRYSTALEE LENTZ, | ) | |
|    *Plaintiff*, | ) | |
| | ) | |
|    *vs.* | ) | 1:10-cv-00045-JMS-TAB |
| | ) | |
| MICHAEL ASTRUE, | ) | |
|    *Defendant.* | ) | |
| | ) | |

## **ORDER**

Crystalee Lentz applied for Social Security Disability Insurance and Supplemental Security Income benefits ("benefits") on June 27, 2006, alleging a disability onset as of January 1, 2000. [Dkt. 14-5 at 2.] Through a variety of administrative proceedings, including an October 2008 hearing at which she appeared with counsel before Administrative Law Judge Tammy H. Whitaker ("ALJ"), the Commissioner denied her application. [Dkt. 14-4 at 20, 25; dkt. 14-2 at 14.] Ms. Lentz now requests review of the ALJ's decision pursuant under Title II of the Social Security Act, 42 U.S.C. §405(g).[1]

### I.
#### BACKGROUND

Ms. Lentz was 26 at the onset of her alleged disability and 35 on the date of the ALJ's decision. [Dkt. 14-2 at 37.] She has been diagnosed with a host of physical and mental impairments,[2] including a personality disorder, post-traumatic stress disorder ("PTSD"), social anxiety

---

[1] Because the relevant sections of the Social Security Disability regulations are virtually the same as the Supplemental Social Security Income regulations, the Court cites to the former. The parallel sections of the Supplemental Social Security Income regulations are located at 20 C.F.R. § 416.900 and 20 C.F.R. §§ 416.1400 – 416.1499.

[2] Ms. Lentz does not dispute the ALJ's reasoning with respect to her physical impairments; therefore the Court will only recite facts relevant to her mental impairments.

disorder, agoraphobia with panic disorder, dissociative disorder, and depression. [Dkt. 14-2 at 21.]

### A) Education and Employment History

Ms. Lentz has a high school education through a GED program. [*Id.* at 38.] Between 1993 and 1995, she worked full-time as a cook and waitress. [*Id.* at 71-72.] For nine years thereafter, she worked as a part-time manager of an escort service, but she left due to stress in her personal life. [*Id.* at 69-71.] For several years during that time, she also worked full-time for a lawn care company. [*Id.* at 68-69.] Also during that time, she worked the graveyard shift full-time at a laundromat, but she quit after four months to care for her children. [*Id.* at 70-71.]

In 2004, Ms. Lentz worked as a full-time cashier at a gas station, but she was terminated after nine months for taking a day off. [*Id.* at 50-51.] From September through November 2006, she worked as a pizzeria manager but left because of stress. [*Id.* at 66-67.]

Ms. Lentz last worked full-time in 2007 as a hotel housekeeper—she quit after a month because she was having seizures. [*Id.* at 48.]

### B) Medical History

Dr. Arnold, Ms. Lentz's psychologist, began treating her on March 14, 2006. [Dkt. 14-9 at 37.] Dr. Arnold saw Ms. Lentz about ten times between March and July, during which time she exhibited symptoms of agoraphobia, chronic depression, and PTSD from physical and sexual abuse. [*Id.* at 37-49.] She continually had panic episodes, [*id.* at 40-41], and was especially anxious around crowds. [*Id.*] She struggled, but managed, to go to stores and appointments for short periods of time with the help of coping objects such as a carrying stuffed animal. [*Id.* at 42-43.] She was able to get her son to school, go to stores occasionally, go out to restaurants occasionally (though she often left mid-way through meals due to panic), go to appointments if friends drove her, watch TV, and clean her house. [Dkt. 14-9 at 37-40.]

Throughout that time, Ms. Lentz was prescribed various anti-depressants by her primary care physician, Dr. Porvaznik, which seemed to reduce the extent of her depression when she took them as prescribed. [Dkt. 14-11 at 50-56.]

In mid-July 2006, Dr. Arnold diagnosed Ms. Lentz with panic disorder with agoraphobia, dysthymia (low-grade depression), rule out (a provisional diagnosis of) recurrent major depression, nicotine dependence, and rule out PTSD, obsessive compulsive disorder ("OCD"), dissociative identity disorder, and impulse control disorder. [Dkt. 14-9 at 36.] Dr. Arnold opined at that point that Ms. Lentz's panic and severe agoraphobia made it difficult for her to go in public places or work around others, and that she had a hair-trigger temper with a history of walking out on jobs and assaulting others whom she felt disrespected her. [*Id.*] He also reported that she cleaned excessively, was able to sleep only during the day, and displayed chronic depressive symptoms—including poor sleep and appetite, fatigue, and periods of sitting and staring. [*Id.*] He assigned her a GAF[3] score of 45. [*Id.*]

Dr. Arnold reported the same in a letter written one week later on Ms. Lentz's behalf. [*Id.* at 34-35.] In his letter, he further stated that Ms. Lentz's inability to sleep in the dark due to post-traumatic stress symptoms "would make it impossible for her to do jobs which require regular daytime hours." [*Id.* at 35.] He opined that although Ms. Lentz might make some progress with medication and long-term therapy, "it appear[ed] unlikely that this would be sufficient to reverse this disability." [*Id.*] Based on his assessments, Dr. Arnold deemed Ms. Lentz "totally incapable of substantial gainful employment." [*Id.* at 35].

---

[3] The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32-34 (2000). It requires assessing a current level of symptom severity and functioning and adopting the lower of the two scores. *Id.* The range of scores indicating serious symptoms begins at 41 and ends at 50; the range for moderate symptoms begins at 51 and ends at 60; and the range for mild symptoms begins at 61 and ends at 70. *Id.*

In a treatment plan he devised that September, Dr. Arnold maintained his previous diagnoses. [Dkt. 14-11 at 49.]

On September 5, 2006, state agency reviewing psychologist Dr. B. Randal Horton completed a Psychiatric Review Technique Form and a Functional Capacity Assessment of Ms. Lentz, in which he opined that Ms. Lentz's mental impairments mildly restricted her activities of daily living; markedly restricted her social functioning; and moderately restricted her concentration, persistence, or pace, and that she had no episodes of decompensation. [Dkt. 14-9 at 62-78.] He further opined that the medical evidence of record and Ms. Lentz's reported activities of daily living indicated that she retained the ability to do simple repetitive tasks, "preferably not in a highly social environment," and that he did not give controlling weight to Dr. Arnold's opinion because Ms. Lentz's reported activities of daily living "d[id] not fully support it." [*Id.* at 78.] Dr. Horton also completed a Disability Determination and Transmittal Form. [Dkt. 14-3 at 2-3.]

On January 2007, Consulting Psychologist Deborah Zera performed a mental status examination of Ms. Lentz. [Dkt. 14-11 at 59-64.] Dr. Zera opined that Ms. Lentz showed appropriate social skills; seemed able to perform simple tasks with supervision; had intact judgment and reasoning; and appeared to have an intact capacity for attention, concentration, and memory. [*Id.* at 62.] She suggested further testing exclusively "to specify her areas of learning disability." [*Id.*] Dr. Zera also diagnosed Ms. Lentz with PTSD, panic disorder with agoraphobia, rule out dissociative identity disorder, rule out depressive disorder not otherwise specified; secondarily diagnosed her with a learning disability not otherwise specified, and rule out personality disorder not otherwise specified; assigned her a GAF score of 40; and opined that she could manage her own funds. [*Id.* at 61.]

In February 2007, state agency reviewing psychologist Dr. Gange reviewed all of the evidence in Ms. Lentz's file and affirmed Dr. Horton's September 2006 opinion as written. [Dkt. 14-11 at 65.] He also completed a Disability Determination and Transmittal Form. [Dkt. 14-3 at 4-5.]

That month, Dr. Porvaznik completed a physician questionnaire form, in which he reported that Plaintiff had no side effects from her medications; opined that "employment may not be possible due to a seizure disorder." [Dkt. 14-11 at 68.]

In June 2007, Dr. Porvaznik opined that Plaintiff's depression and other impairments were "all under good control." [Dkt. 14-13 at 43.] In February 2008, Dr. Porvaznik reported that Ms. Lentz's depression was responding to the anti-depressant he had prescribed. [*Id.* at 30.]

**C) Ms. Lentz's Testimony**

At the hearing, Ms. Lentz testified that the most substantial impediment to her ability to work was her fear of society. [Dkt. 14-2 at 51.] She stated further that after her father-in-law died in 2005, she had a nervous breakdown and did not leave home for three months. [*Id.* at 52.] When Ms. Lentz began seeing doctors regularly in 2005 and 2006, she could only make her appointments when accompanied by someone familiar. [*Id.* at 53.]

Ms. Lentz testified that a handful of people would cause her to "freak out" and have breathing troubles. [*Id.* at 61.] For example, she could be in her backyard but would go inside even if kids came out to play. [*Id.* at 61.] Likewise, her mother did her grocery shopping, and Ms. Lentz would sit in the car. [*Id.* at 62.]

**D) Vocational Expert Testimony**

At the hearing, Vocational Expert Constance Brown stated that Ms. Lentz could not perform her past work. [*Id.* at 77-78.] The ALJ then posed a hypothetical question to the vocational expert, asking specifically what work was available in the national economy for someone with

Ms. Lentz's vocational profile who could perform simple, routine, repetitive tasks at the medium exertional level, could work only from dusk to dawn, could not drive, and could not interact with the public or with co-workers. [Dkt. 14-2 at 81-87.]

The vocational expert was confused by the dusk-to-dawn limitation but nevertheless testified that such a person could perform the representative light, unskilled job of a housekeeper/cleaner. [*Id.* at 82-83.] At the end of her testimony, the ALJ clarified the confusion over the dusk-to-dawn limitation, whereupon the vocational expert reduced the number of jobs available in the economy by half—to about 8,000 state-wide. [*Id.* at 82-83.]

When the ALJ asked the vocational expert whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), she testified that the DOT does not address interaction with the public or co-workers, driving, or working at night. [*Id.* at 85.] Therefore, to the extent she testified in response to a hypothetical question that included these restrictions, the basis for that testimony was her experience of 30 years as a vocational rehabilitation counselor. [*Id.* at 85-86.]

Ms. Lentz declined to ask the Vocational Expert any questions. [*Id.* at 87.]

### E) The ALJ's Determination

The ALJ found that Ms. Lentz had the following severe impairments: asthma and chronic obstructive pulmonary disease, seizures, depression, dysthymia, panic disorder with agoraphobia, PTSD, dissociative identity disorder, and personality disorder. [Dkt. 14-2 at 21.] However, at Step Three, the ALJ found that Ms. Lentz's mental impairments, alone or in combination, did not meet or medically equal the requirements for Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), or 12.08 (personality disorders). [Dkt. 24-30]; *see* 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.04, 12.06, 12.08.

The ALJ further found that Ms. Lentz had the residual functional capacity to work in a limited range of jobs at a medium level of exertion, stating specifically that she has:

> the residual functional capacity [RFC] to perform medium work . . . except she is limited to climbing ladders, ropes, and scaffolds on no more than an occasional basis. She can climb ramps and stairs frequently. She can balance, stoop, crouch, kneel, and crawl on an occasional basis. She must avoid concentrated exposure to extreme cold and extreme heat, and she must avoid all exposure to wetness and humidity. She must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases. She cannot perform jobs that require her to drive. She is limited to jobs requiring her to work from dusk to dawn. She is limited to work involving simple, routine, and repetitive tasks. She is limited to work that does not require her to interact with the public or co-workers.

[*Id.* at 32.]

Relying largely on vocational expert testimony, the ALJ determined that given her residual functional capacity, Ms. Lentz could perform a limited range of housekeeping jobs and is therefore not disabled. [*Id.* at 39-40.]

## II.
### STANDARD OF REVIEW FOR DISABILITY DETERMINATIONS

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423(d)(1)(A). In order to qualify for disability benefits, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity she is not disabled, despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two,

if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in significant numbers in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). In order to be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into [her] reasoning . . . and] build an accurate and logical bridge from the evidence to [her] conclusion." *Id.*

### III.
#### DISCUSSION

Ms. Lentz claims that the ALJ erred at step three by failing to call a medical expert and by misrepresenting evidence; erred in making her RFC determination by failing to support that

determination with substantial evidence; and erred at step five by relying on an invalid RFC and relying on impermissible testimony by the vocational expert in making her disability determination.[4]

**A) Step Three Analysis**

Ms. Lentz contends that, "due to the significant and strong evidence of severe agoraphobia with severe and seriously low GAF scores, a medical expert should have been called by the ALJ to determine equivalency to listings 12.04, 12.06 and 12.08 and to yield insight into actual mental health limitations." [Dkt. 27 at 25.]

As an initial matter, it is Ms. Lentz's burden to show that her mental impairments, alone or in combination, met or medically equaled *all* of the requirements of a listing. *See* 20 C.F.R. § 404.1520; *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

"The ALJ is not required to order medical examinations, but may do so if an applicant's medical evidence about a claimed impairment is insufficient [to make a disability determination]." *Skinner v. Astrue*, 478 F.3d 836, 843-44 (7th Cir. 2007); *see* 20 C.F.R. § 404.151999a)(b). Nevertheless, it is well-settled that in the absence of conflicting evidence in the record, disability forms completed by state agency physicians conclusively establish that a physician designated by the Agency has given consideration to the question of medical equivalence. *See* Social Security Ruling (SSR) 96-6p, 1996 WL 374180 at *3 (July 2, 1996); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

---

[4] The Court notes that Ms. Lentz also accuses the ALJ of erring at step four by cursorily determining that Ms. Lentz had not met the standard of past relevant work. [Dkt. 27 at 26.] However, because any error at step four could only be in Ms. Lentz's favor as the ALJ did not find that she can perform her past work. Any error is, therefore, harmless and not grounds for remand. *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir.2003). To the extent applicable, the Court will consider Ms. Lentz's arguments as they bear on the ALJ's determination at step five.

Here, Dr. Horton completed and signed a PRFT, and Dr. Gange completed and signed a Disability Transmittal Form—both of which provide substantial evidence supporting the ALJ's step-three finding. In opposition to this evidence, Ms. Lentz has presented no contradictory evidence that she meets any of the requirements for any of the listings above. The Seventh Circuit found that, where the ALJ did not reject evidence which would have supported the claimant's contrary position, the ALJ was not required to provide reasons for accepting the state agency physicians' opinions. *Scheck*, 357 F.3d at 700-01. Without articulating how or why she meets a listed impairment, Ms. Lentz gives the Court no reason to doubt the reasoning of the ALJ or the medical opinions in the record.

As to Ms. Lentz's sole assertion that her GAF scores would constitute a listed impairment if evaluated by an expert, the Seventh Circuit has been clear: Neither is the ALJ required to determine the extent of an individual's disability based on her GAF score, nor is she required to mention it if it does not bear on the overall assessment.[5] *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003).

Given that the court must generally defer to the ALJ's reasoned judgment, *Kendrick v. Shalala,* 998 F.2d 455, 456-58 (7th Cir. 1993), and given also that there is no affirmative evidence suggesting that the ALJ was unable to make a disability determination based on the existing record evidence, the Court finds that the ALJ did not commit reversible error by refusing to order a medical examination. *See Skinner*, 478 F.3d at 843-44.

---

[5] Furthermore, the ALJ specifically considered Ms. Lentz's GAF scores before determining that they were not persuasive enough to constitute a listed impairment in light of the entire record— including her daily living and her past part-time work. [Dkt. 14-2 at 34-35.]

### B) The RFC Assessment[6]

Ms. Lentz argues that her mental residual functional capacity is erroneous because the ALJ failed to incorporate evidence favorable to Ms. Lentz into her decision and because the ALJ mischaracterized the evidence upon which she relied. [Dkt. 27 at 20.]

#### 1. Did the ALJ Err by Failing to Properly Consider Dr. Arnold's Medical Opinion?

Ms. Lentz first argues that the ALJ did not properly give controlling weight to Dr. Arnold's overall opinion that Ms. Lentz did not have the capacity to work. [*Id.* at 21, 22.] Instead, she contends, the ALJ "attributes to him limitations which he did not give," such as avoiding contact with co-workers and working from dusk to dawn. [*Id.*] Therefore, she argues that the RFC assessment is in error.

An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). However, an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Likewise, the ALJ is "not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians" in making her RFC determination. *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). Although the ALJ must give consideration to the opinions of medical sources in evaluating whether a plaintiff is disabled, the final responsibility for deciding a plain-

---

[6] Although Ms. Lentz does not challenge her RFC with respect to her physical impairments, the Court is skeptical of the extent to which Ms. Lentz could "climb[] ladders, ropes, and scaffolds," [dkt. 14-2 at 32], given the physical limitations evidenced in her medical records. In any event, placing irrelevant limitations on a claimant merely because they appear in the stock language commonly used by ALJs undermines the credibility of any particular ALJ's opinion—though not fatally here as the occupation of housekeeper would not require climbing.

tiff's specific work-related or RFC limitations is reserved to the ALJ. *See* 20 C.F.R. § 404.1527(e)(2).

In determining Ms. Lentz's RFC, the ALJ stated, "I give little weight to Dr. Arnold's overall opinion that the claimant is disabled and is not capable of performing substantial gainful activity because that is an opinion reserved to the Commissioner of Social Security," citing correctly to 20 CFR 404.1527(e) and 416.927(e) for this proposition. [Dkt. 14-2 at 35.] The ALJ then went on, appropriately, to give "a great deal of weight to Dr. Arnold's specific statement of limitations. . . ."[7] [*Id.*] Indeed, she directly addressed each of the functional limitations Dr Arnold mentioned and accordingly "incorporated into the claimant's residual functional capacity limitations to simple, routine, and repetitive tasks; working from dusk to dawn; and to avoiding interaction with the public and co-workers." [*Id.* at 34.]

The ALJ's opinion makes clear that she sufficiently considered Dr. Arnold's medical assessment in light of the entire record and incorporated it properly into her RFC determination. 20 CFR 404.1527(e) and 416.927(e). Thus, the Court finds no error.

### 2. Did the ALJ Properly Consider Dr. Zera's Medical Opinion?

Ms. Lentz also argues that the ALJ erred in making her RFC determination by failing to flesh out Dr. Zera's limitation that Ms. Lentz only "seemed able to perform simple tasks with supervision." [Dkt. 27 at 22 (citing to dkt. 14-11 at 62).] Through a series of rhetorical questions, Ms. Lentz circuitously argues that the bare word "supervision" is too subjective for any

---

[7] Although Ms. Lentz argues that "Dr. Arnold made no reference to an ability to work 'dusk to dawn,' nor did he give ANY specific functional limitations," [*id.* at 21 (emphasis original)], the record reveals otherwise. Dr. Arnold stated that it would be "impossible for her to do jobs which require regular daytime hours." [Dkt. 14-9 at 35.] The Court understands "dusk to dawn" to be the opposite of "daytime hours," and therefore acceptable as used here. As to Ms. Lentz's limitations, Dr. Arnold mentioned her difficulty getting along with co-workers, her agoraphobia, her "hair-trigger temper," and her reading comprehension. [*Id.* at 34-35.]

tribunal to interpret without the help of a "mental health expert to interpret this medical information." [*Id.* at 22.]

Ms. Lentz did not raise concerns any about any ambiguity inherent in the word "supervision" to the ALJ when she had the opportunity to do so. Therefore, the ALJ could only interpret the term supervision in the context of Dr. Zera's entire medical opinion. In that opinion, Ms. Zera's comment about supervision is immediately surrounded by her opinions that Ms. Lentz showed appropriate social skills; had intact judgment and reasoning; and appeared to have an intact capacity for attention, concentration, and memory. [Dkt. 14-11 at 62.]

Just as the ALJ cannot cherry-pick facts to support a non-disability finding, neither can Ms. Lentz ignore the context of medical opinions or present phrases to the Court out of context. *See Myles,* 582 F.3d at 678. Taken in context, any reasonable ALJ would interpret Dr. Zera's medical opinion to mean that Ms. Lentz was capable of working.

Therefore, the ALJ did not commit reversible error by failing to call an expert to expound upon the meaning of "supervision."

### 3. Did the ALJ Err by Failing to Consider All the Evidence?

Finally, Ms. Lentz contends that the ALJ erred by relying upon Dr. Horton's September 2006 opinion, which did not include Dr. Zara's evaluation, which had not yet occurred. [*Id.*] Accordingly, Ms. Lentz argues that the ALJ erred in making her RFC assessment because "no interpretation by a medical expert has been done on the issue [of Ms. Lentz]'s residual functional capacity on the basis of all of the evidence." [Dkt. 27 at 25.]

To the contrary, however, the Court finds that the ALJ considered the diagnoses and observations of every evaluating medical expert at length in her opinion. [Dkt. 14-2 at 32-37.] Indeed, Dr. Zera's opinion does not suggest that Ms. Lentz meets the requirements for a listed impairment. [Dkt. 14-11 at 62-65.] Furthermore, Dr. Gange reviewed the entire record in February

2007—after the examination by Dr. Zera—before affirming Dr. Horton's September 2006 opinion as written. [*Id.* at 65.]

The Seventh Circuit has held that disability forms completed by state agency physicians conclusively establish that a physician designated by the Agency has given consideration to the medical evidence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Because Dr. Gange signed off on the disability forms after all the evidence had been collected, the Court finds that the ALJ's determination of Ms. Lentz's RFC was not made on only a partial review of the evidence. *Id.*

### C) The ALJ's Step Five Assessment

Ms. Lentz claims the ALJ's step five determination is not supported by substantial evidence because the hypothetical question she posed to the vocational expert was based on an incomplete RFC finding; because the vocational expert was confused by one of the limitations in the hypothetical question; and because the vocational expert's testimony was inconsistent with the Dictionary of Occupational Titles. [Dkt. 27 at 28-30.]

#### 1. Did the ALJ Err by Posing an Improper Hypothetical Question?

Ms. Lentz argues that the ALJ failed to offer hypothetical questions to the vocational expert that contained any reference to simple tasks with "supervision." [Dkt. 27 at 28.] Specifically, she argues that the ALJ intentionally neglected to discuss supervision because suggesting simultaneously that she needs supervision and that she has no social interaction is logically impossible. [*Id.*]

Although failure to incorporate a claimant's limitations in a hypothetical question posed to a vocational expert may require remand, *Magee v. Astrue*, 2008 U.S. Dist. LEXIS 33622 (S.D. Ind. 2008), the ALJ is required only to incorporate into her hypotheticals those impairments and

limitations to the extent that they are credible and supported by medical evidence.[8] *Schmidt*, 496 F.3d at 846; *Herron v. Shalala*, 19 F.3d 329, 327 (7th Cir. 1994).

Here, the ALJ's questions were decidedly confusing to the vocational expert and to the Court. Instead of incorporating limitations by reference to previous questions, reiterating every limitation in every new hypothetical question would be a far more effective way of extracting valid information from the vocational expert.

Nevertheless, the hypothetical question at issue did in fact reflect the limitations she found to be fully credible and supported by the medical evidence. [Dkt. 14-2 at 27-37.] Moreover, Ms. Lentz had the opportunity to question the vocational expert herself and to add the absent limitation—she chose not to. [Dkt. 14-2 at 89.]

Where, as here, a hypothetical question accurately identifies the limitations credibly supported by the record, the vocational expert's response to that question is substantial evidence in support of the ALJ's decision. *See Schmidt*, 496 F.3d at 846.

Therefore, the Court finds that—although unnecessarily confusing—the ALJ's hypothetical question was properly posed.

### 2. Did the ALJ Err by Improperly Relying on the Vocational Expert's Confusion?

Ms. Lentz also argues that the ALJ's hypothetical question to the vocational expert leaves an impermissible gap in the sequential analysis at step five. [Dkt. 27 at 29.] Specifically, she argues that the vocational expert was confused by the hypothetical question involving the "odd-

---

[8] The Court is mindful, as the ALJ should be, that the Seventh Circuit has recently condemned the routine ALJ practice of stating that "although the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," where the ALJ "fail[s] to indicate which statements are not credible and what exactly 'not entirely' is meant to signify." *Spiva v. Astrue*, --- F.3d ----, 2010 WL 4923563, *1 (7th Cir. 2010).

ball" limitation of working only from dusk to dawn. [Dkt. 27 at 29.] Ms. Lentz claims that the ALJ relied on the answer that was predicated on her initial confusion, whereas her amended response in fact indicated that there was no work available for her in the national economy. [*Id.*]

Upon reviewing the record, however, the Court finds no merit to this claim. First, the vocational expert resolved her confusion on the record. [Dkt. 14-2 at 83, 85-86.] Likewise, she indicated sufficient understanding of the dusk-to-dawn restriction by explicitly taking into account that the restriction reduced the number of jobs by almost half. [Dkt. 14-2 at 82.] Finally, when she was later given an opportunity to amend her answers, she testified that under the restrictions posed, Ms. Lentz could not engage in her past relevant work—not that there are no jobs that she can perform. [*Id.* at 86.]

The Court therefore finds that the vocational expert's initial confusion did not render her testimony impermissible for establishing that Ms. Lentz was capable of engaging in other work in the national economy at step five. *See Schmidt*, 496 F.3d at 846.

### 3. Did the ALJ Err by Failing to Resolve Inconsistencies Between the Vocational Expert's Testimony and the DOT?

Finally, Ms. Lentz argues—offhandedly and without citations to the record or to case law—that the ALJ did not properly resolve an alleged inconsistency between the vocational expert's testimony and the DOT. [Dkt. 27 at 29-30.] Although the Commissioner wages a lengthy defense against potential variations of this contention, [dkt. 35 at 25], the Court need not address them. Ms. Lentz failed to develop a cogent argument regarding the inconsistency between the vocational expert's testimony and the DOT; therefore, the Court deems it waived. *See Bright v. Colgate-Palmolive Co.*, 2005 U.S. Dist. LEXIS 15470, *45-46 (S.D. Ind. 2005).

## IV.
### CONCLUSION

The ALJ did not question that Ms. Lentz has a host of mental and physical impairments. However, "[t]he standard for disability claims under the Social Security Act is stringent. . . . Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 274 (7th Cir. 2010) (per curiam). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. Taken together, the Court can find no legal basis to overturn the Commissioner's decision that Ms. Downey does not qualify for disability benefits.

Therefore, the decision below is **AFFIRMED**. Final judgment will be entered accordingly.

01/06/2011

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Annette Lee Rutkowski
KELLER & KELLER
annette@2keller.com